**NANCY SHER,** *et al.,*

      **Plaintiffs,**

**v.**                                                                 **Case No.: 8:08-cv-889-T-33AEP**

**RAYTHEON COMPANY,**

      **Defendant.**

_____/

<u>**ORDER**</u>

    This is a complex toxic tort case that Plaintiffs seek to pursue as a class action under Fed. R. Civ. P. 23. Before the Court are Plaintiffs' Class Certification Motion and Memorandum of Law in Support (Doc. 83), Defendant's Response and Memorandum of Law in Opposition (the "Response," Doc. 93), and Plaintiffs' Reply to the Response (Doc. 102).

    The Court held an evidentiary hearing from September 21, 2009 to September 23, 2009 (the "Hearing") on the Class Certification Motion. In advance of the Hearing, the parties filed a Joint Pre-Evidentiary Statement (Doc. 120), which included submission of stipulated facts and separate Proposed Conclusions of Law (Docs. 121 and 123). Defendant also filed a Response to Plaintiffs' Proposed Conclusions of Law (Doc. 127). Following the Hearing, the parties filed Post-Hearing Motions and Memoranda (Docs. 137 (Defendant) and 138 (Plaintiffs)). For the reasons that follow, the Class Certification Motion (Doc. 83) is **GRANTED.**[1]

---

[1] For a district court to certify a class action, the plaintiffs must have standing, and the putative class must meet each of the requirements specified in Federal Rule of Civil Procedure 23(a), as well as at least one of the requirements set forth in Rule 23(b)." <u>Klay v. Humana, Inc.</u>, 382 F.3d

## I.    Factual and Procedural History[2]

Defendant, Raytheon Company, owns a facility located at 1501 72nd Street North, St. Petersburg, Florida (the "Facility") at which various industrial activities have been conducted over the years - including electronics assembly, electroplating and vapor degreasing.[3]  It is undisputed that these industrial activities caused chemicals (hereinafter referred to interchangeably as Contaminants of Concern or "COCs," chemicals or contaminants) including TCE, vinyl chloride and 1, 4-dioxane,[4] to leak into the soil and groundwater[5] at the Facility. (Doc. 120, Stipulated). It is alleged that the leaked chemicals have migrated beyond the boundaries of the Facility and into the surrounding neighborhood, commonly known as

---

1241, 1250 (11th Cir. 2004). Plaintiffs sought certification under the requirements of Rule 23(a) and under Rule 23(b)(2) and 23(b)(3).  The Court grants the Class Certification Motion pursuant to Rule 23(a) and 23(b)(3).

[2] The Court references stipulated facts with the designation, "Doc. 120, Stipulated;" Plaintiffs' Exhibits shall be designated as "Exhibit Name, PX, #" and Defendant's Exhibits shall be designated as "Exhibit Name, DX, #."

[3] In addition to the industrial activities referenced above, past industrial activities undertaken at the Facility have included hand and mass soldering, coating, painting, chrome conversion, electroplating, metal finishing, photo-imaging, environmental product testing, photographics, machining, electronics engineering, and laboratory functions. (Amend. Compl. at p. 2; Doc. 120, Stipulated).

[4] According to the Agency for Toxic Substances & Disease Registry ("ATSDR"), exposure to TCE can cause impaired heart function, impaired fetal development in pregnant women, nerve damage, kidney damage, liver damage, cancer and death; exposure to vinyl chloride can cause liver cancer, brain cancer, lung cancer, cancers of the blood, and damage to sperm and testes; and exposure to 1,4-dioxane can cause liver and kidney diseases and cancer.  Further, the ATSDR noted that 1,4-dioxane does not degrade, does not stick to soil particles and moves easily from soil into groundwater. (Amend. Compl., pp. 1-2, n.1 and n.2 (internet links omitted)).

[5] The environmental issues in this litigation pertain to the groundwater, not drinking water, which comes from a different source. (Doc. 120, Stipulated).

Azalea (the "Azalea Neighborhood").

E-Systems, Inc. ("E-Systems") owned and operated the Facility from 1974 until Defendant acquired it as part of its 1996 purchase of E-Systems. E-Systems knew about the chemicals causing groundwater contamination as early as 1991, when they were discovered during an environmental site assessment related to construction of the Pinellas Trail. (Amend. Compl. at p. 3, citing to FDEP02160, attached as Ex. B; Mercer Rep. 6). This site assessment was completed by the environmental engineering and consulting firm ARCADIS, formerly known as Mortensen Engineering. (Bedient Rep. 4). ARCADIS continues to investigate the groundwater contamination associated with the Facility. (Bedient Rep. 4; ARCADIS Description of Services Performed to Date, PX 47).

Prior to its acquisition, E-Systems signed a Consent Order with the Florida Department of Environmental Protection ("FDEP") to clean up the Facility's site. (Consent Order ¶ 10, Ex. 1 to Decl. of Christopher Posteraro; RAYSTPETE-00377134, Ex. 2). Defendant was aware of the contamination when it purchased the Facility in 1996. As the Facility's new owner, Defendant was bound by the terms of the Consent Order. (Consent Order ¶ 27, reading that provisions are binding upon E-Systems successors; see also Doc. 120-4, Ex. C (Defendant does not dispute this proposed finding and acknowledged its continuing duty under the Consent Order in the Response, pp. 1-2)).

On August 26, 2000, Defendant asked the Pinellas County Property Appraiser's Office to reduce the Facility's property taxes, citing the "inconvenience, liability and risk to a potential buyer" of the Facility's groundwater contamination. (RAYSTPETE-00405501).

The Pinellas County Property Appraiser's Office granted Defendant's request and lowered the Facility's overall tax assessment. On February 24, 2005, Defendant submitted a Contaminated Property Information Form to the Pinellas County Property Appraiser that read, in pertinent part, "[c]ontamination affects offsite residential properties creating the opportunity for negative community relations and legal liability." (RAYSTPETE-00032360).

Since acquiring the Facility, Defendant has worked with the FDEP to address environmental issues relating to the site. (Response at p. 20). In addition, Defendant submitted a Site Assessment Report to the FDEP on January 28, 2009. (Doc. 120-5 at p. 20). Shortly thereafter, on April 28, 2009, Defendant submitted a proposed Remedial Action Plan ("RAP") to the FDEP. (Doc. 120, Stipulated).

On March 29, 2008, The Tampa Tribune published a story about contamination from the Facility migrating via groundwater beyond the Facility's property and into the surrounding neighborhoods. Plaintiffs are property owners from the Azalea Neighborhood, who owned property there on March 29, 2008, and whose properties have been allegedly contaminated by the release of chemicals from the Facility. Plaintiffs claim that until the March 29, 2008, story in The Tampa Tribune was published, as was discussed in a March 2008 "Mark Douglas" report on a local newscast, they were unaware of any chemical contamination from the Facility or its potential impact on them. See, e.g., Caleca Test., Sept. 21, 2009, Hr'g Tr. 276:23-277:8.

As currently proposed by Plaintiffs, and delineated by their groundwater expert, Dr. Phillip B. Bedient, the proposed class area is located over the contaminated groundwater

plume that leaked from the Facility. Dr. Bedient estimates that the groundwater plume is approximately 1.0-mile-long and 1.5- to 1.7-mile-wide. (Amended Compl. at p. 4; Bedient Rep., Summary ¶ 1). In its current form, the proposed class area consists of over 1,000 property owners and 1,300 parcels of property. (Doc. 120, Stipulated; Class Cert. Mot. at p. 9, referencing Property Map F (hereinafter, the "Property Map" and the "proposed class area")). The proposed class area is composed of ten sub-areas or neighborhoods. (Jackson Rep. 7-8). There are seventeen different property types within the proposed class area, including various residential (single-family, apartments, condominiums); commercial (stores, shopping center); and institutional uses (schools, a church); as well as vacant land. (Jackson Rep. 6; see also Jackson Rep. Ex. 2-1).

## II.    The Named Plaintiffs

As of the date of the Hearing, the Named Plaintiffs in this case are Ms. Nancy Sher, Mr. James R. Abel, Ms. Carol A. Caleca, Mr. Louis Giocondo, and Ms. Betty Key.

### A.    Ms. Nancy Sher

Ms. Sher is the trustee of the trust which holds title to the property located at 1127 Russell Drive, St. Petersburg, Florida. (Doc. 120, Stipulated). Defendant deposed Ms. Sher on April 1, 2009. (Doc. 120, Stipulated).

### B.    Mr. James R. Abel

Mr. Abel owns the property located at 7325 12th Avenue North, St. Petersburg, Florida. (Doc. 120, Stipulated). Mr. Abel had his deposition taken in this litigation on April 3, 2009. (Doc. 120, Stipulated).

**C.    Ms. Carol A. Caleca**

Ms. Caleca owns the property located at 7335 10th Avenue North, St. Petersburg, Florida.  (Doc. 120, Stipulated). She gave her deposition on April 6, 2009. (Doc. 120, Stipulated).

**D.    Mr. Louis Giocondo**

Mr. Giocondo jointly owns, with his wife, a property located at 6945 11th Avenue North, St. Petersburg, Florida. (Doc. 120, Stipulated).  Defendant deposed Mr. Giocondo on April 7, 2009.  (Doc. 120, Stipulated).

**E.    Ms. Betty Key**

Ms. Key owns the property located at 1370 70th Street North, St. Petersburg, Florida. (Doc. 120, Stipulated).  Ms. Key had her deposition taken in this litigation on March 24, 2009. (Doc. 120, Stipulated).

On August 5, 2008, Plaintiffs filed a Consolidated Amended Complaint (the "Amended Complaint," Doc. 61) asserting causes of action against Defendant for trespass, private nuisance, unjust enrichment, negligence, strict liability and liability under Fla. Stat. § 376.313. Plaintiffs also asked the Court to enter an Order certifying this case as a class action pursuant to Fed. R. Civ. P. 23 (the "Class Certification Motion," Doc. 83).[6]

_____

[6]    The Amended Complaint contained a medical monitoring claim, which Plaintiffs voluntarily dismissed (Doc. 77).  Prior to the Hearing, the parties filed a Joint Stipulation Entry of Proposed Order Concerning Evidence of Potential Existence of a Vapor Intrusion Pathway (the "Joint Stipulation," Doc. 126).  In the Joint Stipulation, Plaintiffs agreed that the existence of a vapor intrusion pathway would not be pursued on a class-wide basis and that Plaintiffs would not introduce evidence of the alleged existence of a vapor intrusion to prove claims of trespass, private nuisance, unjust enrichment or strict liability. (Doc. 126-2).  The Court orally approved the Joint Stipulation

Plaintiffs define the proposed class as:

> Persons who on March 29, 2008, owned real property located over defendant Raytheon's groundwater plume as delineated by the map attached as Exhibit F.

> Excluded from the class are (1) the defendant in this action (and its officers, directors and employees), and any entity in which the defendant has a controlling interest, and the legal representatives, heirs, successors, and assigns of defendant; and, (2) any governmental entity, subdivision, agency or department.

(Class Cert. Mot. at p. 16).

At the Hearing, the parties submitted expert reports from their respective groundwater and property experts and called them to testify. (Bedient Rep., Amend. Compl., Ex. D; Kilpatrick Rep., Amend. Compl. Ex. G; Mercer Rep., DX 255; and, Thomas Rep., DX 254) The expert reports, of course, differ markedly as to the size of the proposed class area; whether evidence of contamination exists within that area; and whether the alleged diminution in value to the properties in the proposed class area can be determined on a class-wide basis.

### III.    Expert Opinions

### A.    The Groundwater Opinions

### 1.    Dr. Phillip B. Bedient, Plaintiffs' Expert

Plaintiffs asked Dr. Bedient to evaluate and opine on the source of contamination and the extent of groundwater contamination associated with the Facility. (Bedient Rep. 1). In addition, Plaintiffs asked Dr. Bedient to evaluate the quality of the overall environmental

___

at the Hearing.

investigation and remediation that has been performed at the Facility in response to the groundwater plume. (Bedient Rep. 2; Sept. 21, 2009, Hr'g Tr. 130:17-131:5). At the Hearing, Dr. Bedient opined about the size and location of the groundwater plume. When evaluating and charting the spread of the COCs, Dr. Bedient used a water quality standard that he defined as the presence or absence of COCs. (Sept. 21, 2009, Hr'g Tr. 131:6-25). He did not use a drinking water standard to define the size or magnitude of the plume because "in fact this is not a drinking water . . . aquifer that we're dealing with, but rather with respect to presence or absence of these chemicals." (Sept. 21, 2009, Hr'g Tr. 131:13-20).

Referencing the Property Map, Dr. Bedient discussed what he calls a zone of impact that identifies each and every property that has been affected, at any level, by the COCs migrating from the Facility. (Sept. 21, 2009, Hr'g Tr. 131:21-135:15). Dr. Bedient testified that all of the groundwater contamination that emanated from the Facility has had an impact on all of the properties within the proposed class area. (Sept. 21, 2009, Hr'g Tr. 131:21-135:15).

Part of Dr. Bedient's task was to evaluate the work that ARCADIS performed for Defendant, which included evaluating the plume maps ARCADIS prepared (the "Plume Map"). The Plume Maps are based on drinking water quality standards as established by the State of Florida for the COCs. (Sept. 21, 2009, Hr'g Tr. 136:21-141:7). The Plume Maps were drawn to show all affected properties that would require cleanup. Dr. Bedient testified about the differences between the Property Map and the Plume Map. (Sept. 21, 2009, Hr'g Tr. 138:19-143:13). Specifically, Dr. Bedient testified that the Property Map was not drawn

to encompass only those properties requiring cleanup. The intent of the Property Map, which includes a "buffer zone," is to approximate with a reasonable degree of scientific certainty the last point of impact, or stated differently, the last point of contaminant impact. (Sept. 21, 2009, Hr'g Tr. 185: 1-20).

## 2. Dr. James W. Mercer, Defendant's Expert[7]

During the Hearing, Dr. Mercer testified about the three issues he addresses in his expert report. (Sept. 23, 2009, Hr'g Tr. 80:15-16). First, Dr. Mercer opined that each property within the proposed class area is "unique." (Sept. 23, 2009, Hr'g Tr. 80:23-25). He based this opinion on factors such as the site's complex and heterogeneous hydrology and the concepts of degradation, sorption, and plunging three-dimensional plumes. (Sept. 23, 2009, Hr'g Tr. 81:1-111:6).

Second, Dr. Mercer opined that the properties within the proposed class area must be individually tested because of the wide variability of contamination or non-contamination of properties within the proposed class area. (Sept. 23, 2009, Hr'g Tr. 111:8-123:11).

Third, and finally, Dr. Mercer opined that when identifying the proposed class area and writing his report for Plaintiffs, Dr. Bedient did not adhere to professional standards and his proposed class area reflects an oversimplified analysis of a complex site. (Sept. 23, 2009, Hr'g Tr. 123:14-19). Dr. Mercer bases the third part of his opinion on factors Dr. Bedient allegedly used to "expand" the proposed impact area. Dr. Mercer cites to the fact that Dr.

---

[7] This synopsis of Dr. Mercer's testimony is derived from his expert report, Mercer Rep., DX 255; a Slide Synopsis of his opinions, DX 299; and, his testimony at the Hearing.

Bedient allowed trace detections, an "arbitrary" "buffer zone," and "outliers" or alternate contamination sources to expand the proposed impact area. (Sept. 23, 2009, Hr'g Tr. 123:20-154:4).

**B.      The Property Valuation Experts**

**1.      Dr. John A. Kilpatrick, Plaintiffs' Expert**[8]

Plaintiffs asked Dr. Kilpatrick to offer an opinion as to whether, from a real estate analysis and appraisal perspective, the alleged damages to properties in this case can be determined on a class-wide or mass appraisal basis. (Kilpatrick Rep., Amend. Compl. G, ¶ 4). In Dr. Kilpatrick's expert opinion, which he claims is based on a reasonable degree of scientific certainty, the answer is yes. (Kilpatrick Rep., Amend. Compl. G, ¶ 64). Dr. Kilpatrick opined that the use of a "hedonic regression model" would allow for the class-wide valuation needed to pursue this case as a class action. (Kilpatrick Rep., Amend. Compl. G, ¶¶ 19-64).

In support of his opinion, Dr. Kilpatrick noted that:

- Mass appraisal is a methodology that allows multiple properties to be appraised at the same time using large, statistically valid data sets;

- Hedonic mass appraisal is a widely accepted and commonly used appraisal methodology with published standards and in peer review literature;

- A mass appraisal methodology is superior to an individual appraisal in that it provides a statistical measure of reliability and a consistent application of qualitative judgments to determine the actual value of a property;

_____

[8] This synopsis of Dr. Kilpatrick's opinions is derived from his written expert report, Kilpatrick Rep., Amend. Compl. Ex. G and testimony provided at the Hearing.

- A mass appraisal methodology is more efficient than individual appraisals in that it does not require an individualized appraisal of each and every property in the proposed class area to determine the actual impact of the environmental contamination from the Facility;

- The Pinellas County Property Appraiser maintains a database of property features for each and every property in the proposed class area that is sufficiently robust to allow for its use in a mass appraisal model;

- All of the properties, with the noted exception of five waterfront properties, are characterized by the Pinellas County Property Appraiser as Tax Assessment Area 2 (Appraisal Areas, Pinellas County, Florida, PX 133; Sept. 22, 2009, Hr'g Tr. 107:12-111:14);.

- The Pinellas County Property Appraiser uses a mass appraisal methodology to appraise properties in Pinellas County pursuant to that office's requirement to assess property taxes (Duties of Property Appraiser of Pinellas County, Pam Dubov, CFA, CAE, PX 115; The Florida Real Property Appraisal Guidelines (2002), PX 116);

- A mass appraisal can determine, on a property-by-property basis, the diminution in value, if any, attributable to the groundwater contamination emanating from the Facility; and,

- The majority of the properties within the proposed class area can be assessed using a mass appraisal methodology.

Dr. Kilpatrick cautioned during the Hearing that the model he discussed is not a final formulated model. (Sept. 22, 2009, Hr'g Tr. 54:17-21). His final model would be presented prior to the merits portion of this case and for use during that phase. (Sept. 22, 2009, Hr'g Tr. 55:1-8). Dr. Kilpatrick also called the Court's attention to the noteworthy fact that the Pinellas County Property Appraiser currently uses a mass-appraisal model. (Sept. 22, 2009, Hr'g Tr. 54:2-7).

## 2. **Dr. Thomas O. Jackson**, **Defendant's Expert**[9]

Dr. Jackson opined in his expert report and testified at the Hearing that the properties in the proposed class area cannot be evaluated together on a common, class-wide basis for purposes of determining the extent of any property value impacts. He testified that this is in part because the proposed class area consists of seventeen distinct property types and ten different neighborhoods.

Further, Dr. Jackson opined that the proposed class area contains within it divergent environmental issues, with some properties having no contamination and others having contamination from multiple sources, possibly including the Facility. Based on the divergent environmental issues, Dr. Jackson concluded that the proposed class area appears to be based on criteria that are inconsistent with the accepted definition of environmental contamination used by appraisers, specifically Advisory Opinion 9, which defines environmental contamination as: "Adverse environmental conditions resulting from the release of hazardous substances into the air, surface water, groundwater or soil. Generally, the concentrations of these substances would exceed regulatory limits established by the appropriate federal, state and/or local agencies." (Uniform Standards of Professional Appraisal Practice, Advisory Opinion 9, DX 201(c)).

In direct contrast to Dr. Kilpatrick, Dr. Jackson stated that there is no generally accepted method for analyzing property value diminution for these widely divergent property

---

[9] This synopsis of Dr. Jackson's opinions is derived from the summary section of his expert report, Jackson Rep., DX 254, and the Presentation Slides, DX 298 and testimony he provided at the Hearing.

types with differing environmental impacts from the contaminated groundwater. Dr. Jackson concluded that the properties located in the proposed class area were too diverse to be analyzed together on a class-wide basis. Instead, Dr. Jackson claimed that any analysis of property value diminution would have to consider the multiple combinations of individual property types and sub-areas, *i.e.*, in order to be grouped together for class-action purposes, the properties would need to be of the same property type, approximately the same age, and have the same concentration of hazardous chemicals above regulatory levels, etc. At the Hearing, however, Plaintiffs' counsel provided Dr. Jackson with a letter dated July 24, 2009, from Pam Dubov, the Pinellas County Property Appraiser addressed to Mr. Joseph Saunders, a lawyer for the Plaintiffs. The Letter included an analysis of the property values in the "Azalea Area" that used the mass-appraisal method and a map prepared by ARCADIS. The model demonstrates that the Pinellas County Property Appraiser has determined that properties in and around the plume have experienced a diminution in value of either 5% or 10%. (Cert. Copy of Letter from Pinellas County Property Appraiser, Pam Dubov to Joseph Saunders regarding Azalea Area Analysis, PX 131; Sept. 23, 2009, Hr'g Tr. 280:13-288:3).

### IV.    The Parties' Claims

### A.    Plaintiffs' Claims

Plaintiffs claim that class certification is appropriate under Fed. R. Civ. P. 23 (the "Rule 23 Factors") because the proposed class has been harmed by the chemical release from the Facility and the compensatory and economic damages attendant to the contamination can be adequately ascertained and addressed by class-wide relief. The specific monetary

damages Plaintiffs seek are compensation for the diminution in the value of their properties that the contamination caused and any restoration costs. (Class Cert. Mot. at p. 5). Plaintiffs also seek injunctive relief in order to prevent further harm to, and interference with, the enjoyment of their properties. (Class Cert. Mot. at p. 5).

### B.    Defendant's Claims

Defendant first argues that the Plaintiffs' proposed class definition is improper because it is over inclusive - that is, under Plaintiffs' definition, every property owner would be included even if chemicals from the Facility cannot be detected in their groundwater. Defendant also claims that the Named Plaintiffs cannot satisfy the typicality and adequacy requirements of Rule 23(a). Finally, Defendant contends that Plaintiffs' claims cannot stand under Rule 23(b)(2) because the principal relief Plaintiffs seek is monetary and not injunctive.

Defendant makes its primary argument against certification of the proposed class under Rule 23(b)(3). Specifically, Defendant claims that common issues cannot predominate when the Court will have to make individualized inquiries as to causation and damages for each property owner. Defendant also argues, under Rule 23(b)(3), that a class action lawsuit is not a superior means of resolving Plaintiffs' claims.

### V.    Evidence and Argument Presented at the Hearing

Plaintiffs called Mr. James R. Abel (Named Plaintiff); Ms. Carol Caleca (Named Plaintiff); Dr. Philip B. Bedient (Groundwater Expert); and Dr. John A. Kilpatrick (Property Valuation Expert) as witnesses. Plaintiffs offered designated videotaped deposition testimony

from Defendant's current Manager of Communications and Community Relations, Mr. Jack Radgowski, and Defendant's former Senior Manager for Public Relations, Mr. George Rhynedance.[10] A written copy of designated deposition testimony from Mr. Louis Giocondo (Named Plaintiff) was also submitted by Plaintiffs. Defendant called its expert witnesses, Dr. James W. Mercer (Groundwater Expert) and Dr. Thomas O. Jackson (Property Valuation Expert) to testify.

In their filings and during the Hearing, the parties advanced arguments for and against class certification under all of the Rule 23(a) factors and two of the Rule 23(b) factors, specifically Rule 23(b)(2) and (b)(3). The Court will conduct a rigorous analysis of the applicable Rule 23 Factors as required by the Eleventh Circuit. See Vega v. T-Mobile, USA, Inc., 564 F.3d 1256, 1266 (11th Cir. 2009) (stating, "A district court must conduct a rigorous analysis of the Rule 23 prerequisites before certifying a class." (citations omitted)).

## VI.    Standard of Review

"For a district court to certify a class action, the Named Plaintiffs must have standing, and the putative class must meet each of the requirements specified in Federal Rule of Civil Procedure 23(a), as well as at least one of the requirements set forth in Rule 23(b)." Klay v. Humana, Inc., 382 F.3d 1241, 1250 (11th Cir. 2004); see also Pickett v. Iowa Beef Processors, 209 F.3d 1276, 1279 (11th Cir. 2000). "Failure to establish any one of [the Rule 23(a)] factors and at least one of the alternative requirements of Rule 23(b) precludes class

---

[10] Defendant filed a *Motion in Limine* (Doc. 128) seeking to preclude Plaintiffs from referencing the deposition testimony of Mr. Jack Radgowski and Mr. George Rhynedance at the Hearing. The Court issued an oral Order denying the *Motion in Limine*.

certification." <u>Valley Drug Co. v. Geneva Pharm., Inc.</u>, 350 F.3d 1181, 1188 (11th Cir. 2003). "The burden of proof to establish the propriety of class certification rests with the advocate of the class." <u>Id.</u> at 1187; <u>see also</u> <u>Rutstein v. Avis Rent-A-Car Sys., Inc.</u>, 211 F.3d 1228, 1233 (11th Cir. 2000).

**VII. Analysis**

Rule 23 reads, in pertinent part, as follows:

> (a) Prerequisites. One or more members of a class may sue or be sued as representative parties on behalf of all members only if:
>
> (1) the class is so numerous that joinder of all members is impracticable;
>
> (2) there are questions of law or fact common to the class;
>
> (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class; and
>
> (4) the representative parties will fairly and adequately protect the interests of the class.
>
> (b) Types of Class Actions. A class action may be maintained if Rule 23(a) is satisfied and if:
>
> (1) prosecuting separate actions by or against individual class members would create a risk of:
>
> (A) inconsistent or varying adjudications with respect to individual class members that would establish incompatible standards of conduct for the party opposing the class; or
>
> (B) adjudications with respect to individual class members that, as a practical matter, would be dispositive of the interests of the other members not parties to the individual adjudications or would substantially impair or impede their ability to protect their interests;
>
> (2) the party opposing the class has acted or refused to act on grounds

that apply generally to the class, so that final injunctive relief or corresponding declaratory relief is appropriate respecting the class as a whole; or

(3) the court finds that the questions of law or fact common to class members predominate over any questions affecting only individual members, and that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy. The matters pertinent to these findings include:

(A) the class members' interests in individually controlling the prosecution or defense of separate actions;

(B) the extent and nature of any litigation concerning the controversy already begun by or against class members;

(C) the desirability or undesirability of concentrating the litigation of the claims in the particular forum; and

(D) the likely difficulties in managing a class action.

## A.    Class Definition

Class definition is an overriding concern in environmental or mass toxic tort cases, and although not specifically mentioned in Rule 23(a) or (b), many courts treat "class definition" as a threshold issue. "It is elementary that . . . to maintain a class action, the class sought to be represented must be adequately defined."  DeBremaecker v. Short, 433 F.2d 733, 734 (5th Cir. 1970); see Colomar v. Mercy Hosp., Inc., 242 F.R.D. 671, 675 (S.D. Fla. 2007).   To meet this threshold standard, plaintiffs must "distinguish[] members of the proposed class from the general public based upon" the defendant's alleged actions against them.  Burkhead v. Louisville Gas & Elec. Co., 250 F.R.D. 287, 293 (W.D. Ky. 2008); see also Clausnitzer v. Fed. Express Corp., 248 F.R.D. 647, 655, n.8 (S.D. Fla. 2008).

As a preliminary matter, a class must meet a minimum standard of definiteness that will allow the trial court to determine membership in the proposed class. Earnest v. General Motors Corp., 923 F. Supp. 1469, 1473 (N.D. Ala. 1996). A class definition must specify a "particular group at a particular time frame and location who were harmed in a particular way" and define the class "such that a court can ascertain its membership in some objective manner." Edwards v. McCormick, 196 F.R.D. 487, 491 (S.D. Ohio 2000).

Plaintiffs claim that the proposed definition, as set forth above, is appropriate and meets the minimum standard because it includes a particular group (real property owners), that were harmed during a particular time frame (beginning on March 29, 2008), in a particular location (over Defendant's groundwater plume) and in a particular way (groundwater contamination). Plaintiffs claim that tax records will help determine class membership and that this definition is similar to ones used in other contamination cases.

Defendant contends that the proposed class definition is improper because the geographic boundaries delineated on the Property Map arbitrarily identify a subset of the general public rather than a distinct class of persons affected by Defendant's alleged activities. Specifically, Defendant argues that the putative class would encompass every property owner in the proposed class area - including countless persons whose properties show no detection of chemicals from the Facility.

Defendant submits that other courts have routinely declined to certify classes using geographic definitions plagued by such deficiencies. By way of example, Defendant cites to Duffin v. Exelon Corp., 2007 WL 845336 (N.D. Ill. Mar. 19, 2007). Defendant further

claims that certification is improper if many of the proposed class members have suffered no damages. During the Hearing, Defendant particularly questioned the soundness and preciseness of the methodology Plaintiffs' expert, Dr. Phillip Bedient, used to determine the proposed class area as depicted on the Property Map.

The Court finds Defendant's reliance on <u>Duffin</u> unavailing. According to Defendant, the <u>Duffin</u> court denied class certification in a groundwater contamination case because the proposed class, defined by "arbitrarily drawn lines on a map," was "plainly overbroad" and not sufficiently limited to those properties for which plaintiffs presented evidence of contamination. <u>Duffin</u>, 2007 WL 845336, at *3 and *4.

What the Defendant failed to note when citing to <u>Duffin</u> is that the proposed class was to encompass over 2,500 properties and 6,500 residents. In addition, the proposed class area in <u>Duffin</u> encompassed a 25 mile range. Here, the proposed class area is much smaller, approximately 1.0 mile long by 1.5 to 1.7 miles wide, and the number of potential plaintiffs is also smaller, 1,000. (Amended Compl. at p. 4; Bedient Rep., Summary ¶ 1).

In <u>Duffin</u>, the court found that the proposed class area was defined in geographic terms "unrelated" to evidence of actual contamination because (1) the contamination and groundwater plume were miles from the outer boundaries of the defined class properties; (2) the groundwater plume constituted a fraction of the class area; and (3) the plaintiffs' expert report did not identify elevated chemical levels in locations other than near the plume.

The facts developed to date allow the Court to distinguish <u>Duffin</u> and its progeny. Here, the proposed class area is relatively compact and well-defined; that is, according to

Plaintiffs' groundwater expert, Dr. Bedient, the proposed class area is located directly over the contaminated groundwater plume. In addition, Dr. Bedient's described zone of impact is defined and delineated as it is because of the presence or absence of COCs.

The Court finds that the majority of the arguments Defendant advanced against Plaintiffs' proposed class definition are better addressed under each of the separate Rule 23 Factors than against the "minimum standard" of definiteness required for a proposed class definition to pass muster.

In summary then, the Court finds that the proposed class is sufficiently definite. That is, the proposed class definition makes it possible to identify who is and who is not a class member based on objective criteria. If the evidence above were not enough, Defendant's own efforts to provide contamination notification to selected property owners in the 1990s help prove that the proposed class is sufficiently definite.

In the 1990s, Defendant notified various groups of property owners, such as those from the Stone's Throw Condominium, that migrating contaminated groundwater from the Facility might have an impact on their properties. (Sept. 21, 2009, Hr'g Tr. 84:15-86:18; Min. from Stone's Throw Condominium Assoc. Board of Dir. Mtg., DX 271). The property owners Defendant notified mirror Plaintiffs' proposed class definition. That is, Defendant notified certain groups of real property owners, that were harmed during a particular time frame (the 1990s), in a particular location (over Defendant's groundwater plume) and in a particular way (groundwater contamination).

**B.     Merits of Class Certification**

**1.     Standing**

"[A]ny analysis of class certification must begin with the issue of standing." <u>Griffin</u> <u>v. Dugger</u>, 823 F.2d 1476, 1482 (11th Cir. 1987).  For Article III standing, Plaintiffs must allege that they sustained "personal injury -[in-fact] fairly traceable to the defendant's allegedly unlawful conduct and likely to be redressed by the requested relief." <u>Duffin</u>, 2007 WL 845336, at *2 (quoting <u>Johnson v. Allsteel, Inc.</u>, 259 F.3d 885, 887 (7th Cir. 2001) (other citations omitted)).

Plaintiffs have standing because they have "presented sufficient evidence for purposes of standing to show that they may have been injured-not as a theoretical matter, but rather as a question that is appropriate for judicial resolution." <u>In re</u>: MTBE Prods. Liab. Litig., 458 F.Supp.2d 149, 158 (S.D.N.Y. 2006).

Review of the <u>Duffin</u> case, discussed above, is also particularly informative about standing.  In <u>Duffin</u>, the plaintiffs complained that their properties were contaminated by defendant, Excelon Corporation, when it spilled millions of gallons of water containing potentially harmful radioactive chemicals. The <u>Duffin</u> plaintiffs alleged that this contamination interfered with the use and enjoyment of their properties and diminished their properties' values.   The <u>Duffin</u> court found that plaintiffs' allegations were "adequate to confer Article III standing."  In reaching its decision, the <u>Duffin</u> court cited to <u>Family &</u> <u>Children's Ctr., Inc. v. Sch. City of Mishawaka</u>, 13 F.3d 1052, 1058, n.3 (7th Cir. 1994), for the proposition that the "standing inquiry exclusively addresses whether plaintiffs alleged

facts satisfying constitutional and prudential limitations; the complaint's merits are not relevant." <u>Duffin</u>, 2007 WL 845336, at *2.

Here, Plaintiffs' starkly similar allegations - specifically that chemicals leaked from the Facility have interfered with the use and enjoyment of their properties and caused them to suffer a diminution in the value of their homes - warrant the finding that Plaintiffs have standing. Thus, the Court determines that Plaintiffs have standing under Article III of the United States Constitution. The Court will now examine the Rule 23(a) factors of numerosity, commonality, typicality and adequacy of representation.

### 2.    Rule 23(a)

Rule 23(a) demands that, to sue as "representative parties on behalf of all," the Named Plaintiffs and their attorneys satisfy the closely related requirements of numerosity, commonality, typicality, and adequacy of representation. Fed. R. Civ. P. 23(a); <u>Prado-Steiman <i>ex rel.</i> Prado v. Bush</u>, 221 F.3d 1266, 1278 (11th Cir. 2000) (describing the Rule 23(a) criteria).

### a.    Numerosity

First, a class may be certified only if "the class is so numerous that joinder of all members is impracticable." Rule 23(a)(1), Fed. R. Civ. P. "In order to establish numerosity, the plaintiff must ordinarily demonstrate some evidence or reasonable estimate of the number of purported class members." <u>Kuehn v. Cadle Co.</u>, 245 F.R.D. 545, 548 (M.D. Fla. 2007) (citation and internal quotations omitted). "[W]hile there is no fixed numerosity rule, generally less than twenty-one is inadequate, more than forty adequate, with numbers

between varying according to other factors." Cox v. Am. Cast Iron Pipe Co., 784 F.2d 1546, 1553 (11th Cir. 1986) (citation and internal quotations omitted). Class members in excess of forty can satisfy the numerosity requirement. Colomar, 242 F.R.D. at 675. To satisfy numerosity, the size of the class cannot be speculative. See Id. at 676; Turnage v. Norfolk S. Corp., 2009 WL 140479, at *4 (6th Cir. Jan. 22, 2009).

Defendants do not mount a serious challenge to Plaintiffs' claim that they have met the numerosity requirement. However, Defendant does claim that Plaintiffs' failure to define a putative class of persons who can actually allege harm means that Plaintiffs' assertions about numerosity are fatally speculative. See Turnage, 2009 WL 140479, at *4.

The Court disagrees with Defendant. "At this stage of the proceedings in which class certification is being considered, it is not necessary for the Court to know the precise number of class members. Instead the Court may rely upon reasonable inferences drawn from the known facts." Snow v. Atofina Chem., Inc., 2006 WL 1008002, at *4 (E.D. Mich. Mar. 31, 2006) (citing to In re Am. Med. Sys., Inc. 75 F.3d 1069, 1079 (6th Cir. 1996)); see also In re Carbon Dioxide Antitrust Litig., 149 F.R.D. 229, 232 (M.D. Fla. 1993) ("To meet this requirement, plaintiffs need not prove the exact size of the proposed class, but rather need demonstrate only that the number is exceedingly large, and joinder impracticable.") Plaintiffs have identified 1,300 parcels with over 1,000 potential Plaintiffs. Plaintiffs claim that, given the obvious impracticality of joining potentially hundreds of plaintiffs in this action, they have satisfied the numerosity requirement. Upon due consideration, the Court finds that Plaintiffs have met the numerosity requirement.

### b. Commonality

Second, a class may be certified only if "there are questions of law or fact common to the class." Rule 23(a)(2), Fed. R. Civ. P. "Commonality may be established where there are allegations of common conduct or standardized conduct by the defendant directed toward members of the proposed class." Strube v. Am. Equity Inv. Life Ins. Co., 226 F.R.D. 688, 695 (M.D. Fla. 2005) (citation and internal quotations omitted). Commonality is satisfied when there "is a common issue the resolution of which will advance the litigation." Sprague v. General Motors Corp., 133 F.3d 388, 397 (6th Cir. 1998).

Commonality "does not require that all of the questions of law or fact raised by the case be common to all the plaintiffs." Walco Invs., Inc. v. Thenen, 168 F.R.D. 315, 325 (S.D. Fla. 1996). The fact that individual issues remain "after the common questions of the defendant's liability have been resolved does not dictate the conclusion that a class action is impermissible." Sterling v. Velsicol Chem. Corp., 855 F.2d 1188, 1197 (6th Cir. 1988).

Recognizing the implicit commonality of fact and law in a mass toxic tort case, courts in groundwater contamination cases have characterized the commonality analysis as "straightforward." Mejdrech v. Met-Coil Syst. Corp., 319 F.3d 910, 911 (7th Cir. 2003) (affirming certification of class of property owners in TCE groundwater contamination case). The presence of individualized damages issues does not prevent a finding of commonality. Allapattah Svcs., Inc. v. Exxon Corp., 333 F.3d 1248, 1261 (11th Cir. 2003). The Eleventh Circuit has recently advised district courts that they cannot conflate an analysis of commonality under Rule 23(a)(2) with a predominance analysis under Rule 23(b)(3). See

<u>Vega</u>, 564 F.3d at 1268 . In <u>Vega</u>, the Eleventh Circuit also reminded the district courts that Plaintiffs' burden under this Rule 23 Factor is "relatively light." <u>Id.</u>

Plaintiffs claim that Defendant's course of conduct that caused the contamination is identical for every potential member of the proposed class. Plaintiffs further claim that each potential class member would rely on the same set of operative facts to prove Defendant's liability because there is no dispute that groundwater contamination exists and Defendant is responsible for it. Plaintiffs set forth five shared questions of law and fact in their closing during the Hearing that mirror those set forth in the Amended Complaint (Amend. Compl. at p. 15). It is not necessary to repeat each here; however, by way of example and paraphrased, Plaintiffs asked whether Defendant's release of the contaminants into the soil and groundwater at the Facility was negligent, reckless and/or intentional? (Amend. Compl. at p. 15).

Defendant expends little effort arguing against Plaintiffs' satisfaction of this Rule 23 Factor. Instead, Defendant properly saves the bulk of its arguments against certification for the Rule 23(b)(3) factor, predominance, where they are better addressed. Based on Plaintiffs' ability to demonstrate that some common issues of fact and law exist, the Court finds that the existence "here of some common factual questions the class-wide adjudication of which would advance the litigation . . . will suffice to satisfy the commonality requirement of Rule 23(a)." <u>Cocharan v. OXY Vinyls, LP</u>, 2008 WL 4146383, at *8 (W.D. Ky. Sept. 2, 2008). Thus, the Court finds that Plaintiffs have satisfied the commonality requirement.

### c. Typicality

Third, a class may be certified only if "the claims or defenses of the representative parties are typical of the claims or defenses of the class." Rule 23(a)(3), Fed. R. Civ. P. "[T]ypicality measures whether a sufficient nexus exists between the claims of the named representatives and those of the class at large." Prado-Steiman, 221 F.3d at 1279. "A class representative must possess the same interest and suffer the same injury as the class members in order to be typical under Rule 23(a)(3)." Murray v. Auslander, 244 F.3d 807, 811 (11th Cir. 2001). Typicality is satisfied when a plaintiff's claim "arises from the same event or course of conduct that gives rise to the claims of other class members and is based on the same legal theory." Sala v. Nat'l R.R. Passenger Corp., 120 F.R.D. 494, 497 (E.D.Pa. 1988).

Typicality may be presumed when the plaintiff's claim "arises from the same event or practice or course of conduct that gives rise to the claims of other class members." Snow, 2006 WL 1008002, at *5 (citing to In re American Medical Systems, 75 F.3d 1069, 1082 (6th Cir. 1996) (quoting 1 Herbert B. Newberg & Alba Conte, Newberg on Class Actions, § 3.13, at 3-76 (3d ed. 1992)).

Defendant first claims that Plaintiffs cannot satisfy this Rule 23 Factor because the Named Plaintiffs lack standing. Defendant also claims that the Named Plaintiffs differ from the putative class in a myriad of ways. Some examples cited are the fact that all but one of the Named Plaintiffs have no plans to sell their properties; none own commercial property; and only one uses groundwater. Finally, Defendant claims that the Named Plaintiffs are also subject to unique defenses.

The Court has already found that Plaintiffs have standing to pursue this litigation. The Court has also determined previously that Plaintiffs' claims arise from the same course of conduct, Defendant's contamination of groundwater, and are based on the same legal theories.[11]  Thus, it is appropriate under these circumstances to conclude that Plaintiffs' claims are typical because their claims arise from the same event and course of conduct.

Even if the Court determined that this conclusion was not warranted, the evidence adduced to date makes it very clear that all proposed class members, including the Named Plaintiffs, will be relying on the same underlying legal theories - nuisance, negligence and strict liability to address the same harm - contamination from the Facility.  Although the relief requested may ultimately differ due to different property types and differing rates of diminution in value, the nature of the relief sought is the same for the Named Plaintiffs.

In addition to the evidence cited above, the Court finds the case of Brockman v. Barton Brands, Ltd., 2007 WL 4162920 (W.D. Ky. Nov. 21, 2007) instructive on this point, although more for what it did not find than for what it held.  In Brockman, the Court was unable to find that the Named Plaintiffs were "typical" of the class they purported to represent because the "factual and legal issues of Defendant's liability as to each proposed class member likely could 'differ dramatically from one plaintiff to the next.'"  Brockman, 2007 WL 4162920, at * 6 (citing to Daigle v. Shell Oil Corp., 133 F.R.D. 600,  600 (D. Colo. 1990)).  The Brockman court contrasted its determination with that of the court in Boggs v.

---

[11]  Differing test results on properties within the proposed class area, including "non-detects," does not defeat typicality because this type of argument/evidence is better addressed under Rule 23(b)(3)'s predominance inquiry.

Divested Atomic Corp., 141 F.R.D. 58 (S.D. Ohio 1991). In Boggs the court noted that "[t]he harm suffered by the Named Plaintiffs may differ in degree from that suffered by other members of the class so long as the harm suffered is of the same type." Brockman, 2007 WL 4162920, at * 6, n.5 (citing to Boggs, 141 F.R.D. at 65). The situation here is more akin to Boggs than to that of Brockman.

Defendant's activities at the Facility, which resulted in a contamination leak, have caused harm to the proposed class of property owners, whose various types of property sit above a contamination plume. The Court finds that "typicality concerns are understandably reduced where a court can be assured that whatever trespass or nuisance has occurred, if any, was the result of the defendant's activities." Brockman, 2007 WL 4162920, at *6, n.5 (citing to Olden v. LaFarge Corp., 383 F.3d 495, 508-509, n.5 (6th Cir. 2004). After due consideration, the Court finds that Plaintiffs have met the typicality requirement.

### d. Adequacy

Fourth, a class may be certified only if "the representative parties will fairly and adequately protect the interests of the class." Rule 23(a)(3), Fed. R. Civ. P. "The adequacy-of-representation requirement encompasses two separate inquiries: (1) whether any substantial conflicts of interest exist between the representatives and the class; and (2) whether the representatives will adequately prosecute the action." Busby v. JRHBW Realty, Inc., 513 F.3d 1314, 1323 (11th Cir. 2008) (citation and internal quotations omitted).

To satisfy Rule 23(a)'s adequacy requirement, the Named Plaintiffs must be sufficiently familiar with their case to exercise control over class counsel and protect the

interests of absent class members.  See, e.g., Scott v. NY City Dist. Council of Carpenters Pension Plan, 224 F.R.D. 353, 356 (S.D.N.Y. 2004); Levine v. Berg, 79 F.R.D. 95, 98 (S.D.N.Y. 1978).

Defendant argues that the Named Plaintiffs are not adequate because they are facially unfamiliar with even rudimentary aspects of this case.  Defendant cited to cases supporting its contention, such as Spinelli v. Capital One Bank, No. 8:08-cv-132-T-33EAJ, 2009 WL 700705, at *8 (M.D. Fla. March 14, 2009) (Covington, J.); Scott, 224 F.R.D. at 356; and, Levine, 79 F.R.D. at 98.  At the Hearing and in the Response, Defendant provided the Court a veritable laundry list of the Named Plaintiffs' supposed shortcomings.[12]

Some examples are:

- Mr. Abel admitted that he is "out of [his] league" in seeking to be appointed as a class representative (Abel Dep. Tr. 276-77) and that he only "breezed through the complaint."  (Abel Dep. Tr. 192-93);

- Ms. Sher did not remember whether she had reviewed the Complaint before it was filed.  (Sher Dep. Tr. 232);

- Ms. Key testified that she was unaware that the proposed class definition includes commercial property owners (Key Dep. Tr. 212) or whether the proposed class area includes churches.  (Key Dep. Tr. 217);

- Mr. Giocondo mistakenly believed that Admiral Farragut Academy was too far away to be within the proposed class area in this case, although it is in the area  (Giocondo Dep. Tr. 353) and he further testified that he was "really not sure" he could represent commercial property owners. (Giocondo Dep. Tr. 359); and,

- Ms. Caleca mistakenly testified that she seeks to represent those who

---

[12]  Defendant did not argue that Plaintiffs' counsel was deficient or unable to adequately prosecute this action.

bought their property after the case was filed (Caleca Dep. Tr. 435-36) and that she would still claim to be harmed if chemical exceedences were 20 miles away. (Caleca Dep. Tr. 421).

The Court finds that the Named Plaintiffs will adequately prosecute this action because they are sufficiently familiar with their case to exercise control over class counsel and protect the interests of absent class members. The Court bases its finding on the live testimony presented at the Hearing by the two Named Plaintiffs, Mr. Abel and Ms. Caleca. The Court had the opportunity to observe these two witnesses and examine their demeanor during their testimony. At the Hearing, Mr. Abel and Ms. Caleca demonstrated through their testimony that they each understand the complexities of this case (within reason), have no conflicts with the proposed class at large, and are willing and able to take an active role in the litigation. Mr. Giocondo did the same through his deposition testimony.

Mr. Abel and Ms. Caleca's live testimony and Mr. Giocondo's written deposition designations are sufficient to persuade the Court that they are adequate class representatives. The deficiency examples Defendant provided above have been remedied or were facts that were not significant to the Court's consideration of the Class Certification Motion.

### 3. Rule 23(b)

In addition to satisfying the requirements in Rule 23(a), plaintiffs seeking to certify a class must satisfy the requirements of at least one subsection of Rule 23(b). Vega, 564 F.3d at 1265. Plaintiffs seek certification under Rule 23(b)(2) and 23(b)(3).

### a. 23(b)(2)

A class action can only be maintained under Rule 23(b)(2) the if the relief sought is

primarily injunctive or declaratory and the demand for monetary relief does not predominate. Murray, 244 F.3d at 812. Here, Plaintiffs seek both injunctive and monetary relief.

Defendant argues that Plaintiffs cannot satisfy this Rule 23 Factor because this case is predominantly one for money damages. (Pls. Mem. In Opp'n to Def.'s Mot. to Stay, Doc. 42; Order Denying Defs.' Mot. to Stay, Doc. 47; see also Compl. ¶¶ 62, 68, 79, 84, 90 and 105). Defendant further claims that injunctive relief would be inappropriate because the Facility is no longer in active use and Defendant is working with the FDEP and in conjunction with ARCADIS to remediate historical contamination. See, e.g., Thomas v. FAG Bearings Corp., 846 F. Supp. 1400, 1403-04 (W.D. Mo. 1994) (denying certification of Rule 23(b)(2) injunctive class because defendant had previously discontinued use of contaminant and the injunction sought was "clearly incidental to the monetary relief requested.").

Plaintiffs claim that given the broad remedial scope and thrust of the relief sought, their requests for compensatory and punitive damages do not preclude certification. In addition, Plaintiffs ask the Court to disregard as premature Defendant's argument that injunctive relief is inappropriate because of Defendant's current remediation efforts. Plaintiffs claim that this argument is merit based. See Bentley v. Honeywell, 223 F.R.D. 471, 486 (S.D. Ohio 2004).

The Court acknowledges the power injunctive relief can provide in contamination cases. However, even acknowledging the power of and, perhaps, necessity for, injunctive relief for the proposed class in such a case does not mean that injunctive relief is Plaintiffs'

primary concern.  This Court has determined previously, *albeit* in a different context, that this is primarily a damages case.  Plaintiffs have not provided the Court with persuasive argument or evidence to the contrary.

In his capacity as the District Judge originally assigned to this case, Richard J. Lazzara entered an Order that denied Defendant's Motion to Stay (the "Stay Order," Doc. 47).  In the Stay Order, Judge Lazzara wrote, "the instant case seeks *damages* for loss of use and decrease in property value caused by the contaminants, not the general enforcement of the state's pollution laws in the form of an adjudication of a public nuisance."  (Doc. 47 at p. 8 (emphasis added)).  The fact remains that since this case was filed, it has been predominantly about money damages and injunctive relief has always been incidental to that. Thus, the Court will deny Plaintiffs' request for certification under this Rule 23 Factor.[13]

### b.      23(b)(3)

Fed. R. Civ. P. 23(b)(3) requires plaintiffs to prove both that common issues predominate over individualized issues and that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy.  See Vega, 564 F.3d at 1265 (citations omitted).

### i.     Predominance

"The Rule 23(b)(3) predominance inquiry tests whether proposed classes are sufficiently cohesive to warrant adjudication by representation."  Amchem Prods., Inc. v.

---

[13] Based on the Court's determination above, it is not necessary (or wise) for the Court to entertain Defendant's argument that injunctive relief is improper because Defendant is already working with FDEP to remediate the toxic groundwater contamination plume efficacy.

Windsor, 521 U.S. 591, 623 (1997). "Common issues of fact and law predominate if they ha[ve] a direct impact on every class member's effort to establish liability and on every class member's entitlement to injunctive and monetary relief." Klay, 382 F.3d at 1255 (alteration in original) (citation and internal quotation marks omitted). "[I]t is not necessary that all questions of fact or law be common, but only that some questions are common and that they predominate over individual questions." Busby, 513 F.3d at 1324 (citation and internal quotation marks omitted); see also In re Theragenics Corp. Securities Litig., 205 F.R.D. 687, 697 (N.D. Ga. 2002) (same).

"The predominance inquiry focuses on the legal or factual questions that qualify each class member's case as a genuine controversy, and is far more demanding than Rule 23(a)'s commonality requirement. Rutstein, 211 F.3d at 1233 (citation and internal quotation marks omitted); Vega, 564 F.3d at 1270 (same); Jackson v. Motel 6 Multipurpose, Inc., 130 F.3d 999, 1006, n.12 (11th Cir. 1997).

Courts have found that claims based on a "common cause or disaster" are likely subjects for class certification. Amchem, 521 U.S. at 594. However, the Advisory Committee's note on this factor cautions that "[a]'mass accident' resulting in injuries to numerous persons is ordinarily not appropriate for a class action because of the likelihood that significant questions, not only of damages but of liability and defenses to liability, would be present, affecting the individuals in different ways." See also Henry v. St. Croix Alumina, LLC, 2008 WL 2329223 at *3 (D.V.I. June 3, 2008) ("[C]lass certification is ordinarily 'inappropriate in mass tort claims . . .which present questions of individualized issues of

liability' because such cases are unlikely to satisfy the requirements of Rule 23(b)(3).")
(quoting *In re* LifeUSA Holding Inc., 242 F.3d 136, 145 (3d Cir. 2001)).

Plaintiffs acknowledge that individualized proof will be necessary for certain aspects of their claims. However, Plaintiffs argue that common issues regarding Defendant's course of conduct and its legal effect on Plaintiffs predominate over individual issues.

Here Plaintiffs ask the Court to identify the common liability issues that can be resolved on a class wide basis. In other words, Plaintiffs would like the Court's predominant analysis to focus on the common nucleus of operative facts applicable to all proposed class members. The common issues cited include those pertaining to the elements of three of the claims set forth in the Amended Complaint (Doc. 61). (Doc. 138, pp. 3-11, setting forth the types of evidence and proof common to the proposed class as a whole that will be used to show trespass, negligence, and strict liability).

Plaintiffs submit that the overriding question of whether Defendant contaminated the proposed class area is central to the Court's inquiry. Plaintiffs believe that this central and uniform question is predominate to any perceived differences in the proposed class relating to damages. Finally, Plaintiffs claim that causation will not necessitate an individualized inquiry for each and every potential plaintiff.

In support of this proposition, Plaintiffs rely on cases such as Bates v. Tenco Svcs., Inc., 132 F.R.D. 160 (D.S.C. 1990), finding that Rule 23(b)(3)'s predominance requirement is easily met in groundwater contamination cases, particularly where there is one source of contamination. Plaintiffs also submit that numerous courts have held that variation in

contaminant levels and water distribution patterns do not defeat certification.  See e.g.,

Yslava v. Hughes Aircraft Co., 845 F.Supp., 705, 713 (D. Ariz. 1993); Bentley, 223 F.R.D.

at 487 (individual questions did not defeat class certification in TCE groundwater case and

stating "[t]he Court concurs in the sound reasoning of those other courts, which had cases

before them very similar to this one.").  Plaintiffs remind the Court however, that "the

presence of individualized damages issues does not prevent a finding that the common issues

in [a] case predominate." Allapattah, 333 F.3d at 1261.

By way of providing the following examples, Plaintiffs recall for the Court some of

the common operative facts relevant to this case:

- The Named Plaintiffs have alleged identical legal theories against the Defendant in this action;

- The Named Plaintiffs' claims do not differ from the claims of the proposed class;

- The legal theories upon which the Named Plaintiffs' claims are based do not differ from those upon which the claims of other members will be based;

- The Named Plaintiffs seek the same forms of relief on behalf of themselves and the proposed class;

- The Named Plaintiffs' claims arise from the same course of conduct and set of circumstances, the release of contamination from the Facility;

- The common question of whether Defendant contaminated the proposed class area is shared by all proposed class members;

- Each proposed class member will rely on the same evidence to prove Defendant's knowledge of the dangers posed by the chemicals generated, stored and disposed of at the Facility;

- Each proposed class member will rely upon the same evidence to show the

35

negligent conduct of Defendant;

- Each and every Named Plaintiff owns property within the impacted zone as defined by Dr. Bedient;

- All property owners who own property within the proposed class area are identifiable through publicly available computerized property records;

- Each and every property in the proposed class area has been damaged by the environmental contamination emanating from the Facility; and

- The amount of damages can be determined on a class-wide basis with a mass appraisal methodology as discussed by Dr. Kilpatrick.

(Doc. 120, Ex. 120-4).

As set forth above, these factual and legal issues are common to the potential class members. Furthermore, those factual and legal issues that focus on the activities of the Defendant rather than the activities of the plaintiffs are common to all class members.

In stark contrast to Plaintiffs' contentions, Defendant argues that significant individual inquiries are necessary to resolve each potential plaintiff's claims and there is neither a barrier to individual actions nor a credible threat to judicial resources at issue here. Defendant submits that showing contamination, demonstrating injury to property values or the use and enjoyment of property, and the causation for any injury, as well as the defenses it raised, all require individual proof. In support of this generalization, Defendant sets forth certain facts it believes demonstrate that class certification is not warranted under Rule 23(b)(3).[14]

---

[14] Defendant has raised many of these facts before under the relevant Rule 23 Factor. These facts are that: The proposed class area contains large numbers of properties with wells that have no contamination. (Bedient Dep. Tr. 302 reading, "[T]here are at least dozens if not hundreds

In support of its position, Defendant cites to cases such as <u>Martin v. Shell Oil Co.</u>, 198 F.R.D. 580 (D. Conn. 2000) (denying class certification in groundwater contamination case because varying contamination test results at individual properties indicated that individual issues predominated); <u>Thomas</u>, 846 F. Supp. at 1401-06 (denying class certification in groundwater contamination case because not all properties were equally affected); <u>Henry</u>, 2008 WL 2329223 at *6 (denying class certification because "highly individualized" issues, including the degree of damage suffered by each plaintiff's property, if any, and the contaminant present on each plaintiff's property, if any, presented "highly individualized" issues which predominated over common issues); <u>Fisher v. CIBA Specialty Chems. Corp.</u>, 238 F.R.D. 273, 304-05 (S.D. Ala. 2006) (emphasizing that common issues must not only

---

of wells that have no contamination at all within the" proposed class area.). The proposed class area includes properties where testing has shown that no relevant chemicals were present in the groundwater. (Mercer Rep. 23). The methodology used to draw the Plaintiffs' proposed class area is inconsistent with applicable professional standards. (Mercer Rep. 31; <u>see also</u> Mercer Rep. 22-23). The Property Map proposed by Dr. Bedient, includes properties where the concentrations were too low to be accurately measured or quantified, as well as properties where concentration levels were below the levels required for remediation. (Mercer Rep. 21-22, 31). Dr. Bedient added a "buffer zone" that extends roughly 200 to 500 feet beyond the farthest point at which any test has ever indicated the slightest bit of any chemical in drawing Plaintiffs' proposed class area. (Bedient Dep. Tr. 252-57, 545, 552-54, 578-80; Mercer Rep. 4). Dr. Bedient's buffer zone includes valuable waterfront properties (and other properties) that have been proven entirely free from contamination. (<u>See</u> Ex. D to Class Cert. Mot., Fig. 7). Dr. Bedient's use of a buffer zone is not a methodology recommended in peer-reviewed scientific literature. (Bedient Dep. Tr. 252-57, 545, 552-54, 578-80; Mercer Rep. 4). Dr. Bedient approximated the proposed class area without using a defined, consistent methodology. (Bedient Dep. Tr. 544-46, 563). Dr. Bedient did not do a consistent, thorough evaluation of whether sources other than Defendant contributed to groundwater contamination at the site. (Mercer Rep. 25-28). A portion of Plaintiffs' proposed class area is based on a single test result generated by lab error. (Mercer Rep. 27-28). Plaintiffs' proposed class area cannot be independently replicated. (Bedient Dep. Tr. 544-46, 563). Plaintiffs have not shown that exceedances of any chemicals from the Facility are present on the property of any named Plaintiff. (Sher Dep. Tr. 133-34; Abel Dep. Tr. 21, 23-24, 26-27; Caleca Dep. Tr. 252-56; Giocondo Dep. Tr. 190-92; Key Dep. Ex. 11; Bedient Dep. Tr. 486-92; MacIntosh Dep. Tr. 570-75; Compl. ¶¶ 14-21).

exist but also predominate, and concluding that proof of background facts, such as the defendant's alleged history of producing and disposing of the contaminant, as well as the chemical properties, hazards and toxicity of the contaminants, are insufficient to establish commonality); LaBauve v. Olin Corp., 231 F.R.D. 632, 677 (S.D. Ala. 2005) (same); Reilly v. Gould, Inc., 965 F. Supp. 588, 598 (M.D. Pa. 1997) (same).

Finally, Defendant also baldly informs the Court that it "would become the first federal court in the country to certify an environmental case predicated on such deficient expert testimony. In sum, [P]laintiffs have not begun to satisfy their burden of proof under Rule 23, and certification on this record would be unprecedented." (Doc. 137 at p. 7).

Defendant's expostulation aside, the Court finds that class certification under Rule 23(b)(3) (and thus, under the Rule 23 Factors) is warranted. While honing its arguments against Plaintiffs' experts and focusing on proving that individualized damages would predominate, Defendant has lost sight of the class wide commonalities and unique circumstances present in this litigation that allow Plaintiffs to demonstrate compliance with Rule 23(b)(3)'s predominance requirement.

Defendant spent a significant amount of time during the Hearing attempting to prove that Plaintiffs' experts analyses and opinions are too factually and scientifically deficient to support class certification. As a threshold matter, the Court finds that it is not necessary at this stage of the litigation to declare a proverbial winner in the parties' war of the battling experts or dueling statistics and chemical concentrations. See Caridad v. Metro-North Commuter R.R., 191 F.3d 283, 292-93 (2d Cir.1999) (holding that "statistical dueling"

between parties' experts on fact issues was "not relevant to the certification determination"). This type of determination would require the Court to weigh the evidence presented and engage in a <u>Daubert</u> style critique of the proffered experts qualifications, which would be inappropriate.

At this stage of the litigation, therefore, an inquiry into the admissibility of Plaintiffs' proposed expert testimony as set forth in <u>Daubert</u> would be inappropriate, because such an analysis delves too far into the merits of Plaintiffs' case. <u>See</u>, <u>e.g.</u>, <u>In re</u> Polypropylene Carpet Antitrust Litig.</u>, 996 F.Supp. 18, 25-26 (N.D. Ga.1997) (agreeing that expert's analysis was subject to <u>Daubert</u> test to determine admissibility in court proceedings, but finding <u>Daubert</u> inquiry unnecessary at class certification stage).

The Court has considered the opinions of Plaintiffs' experts, Dr. Bedient and Dr. Kilpatrick. The Court is cognizant of Defendant's well-documented objections to these opinions. However, Dr. Bedient's scholarly credentials are impeccable. Through the Property Map, Dr. Bedient established the geographic contours of the groundwater plume and using peer-reviewed science and relevant data he defined a zone of impact and identified the scope of the class. Dr. Kilpatrick's scholarly credentials are also sound. Dr. Kilpatrick provided Plaintiffs with a viable model for calculating property damages on a class-wide basis. The Court finds therefore, that individual issues do not predominate**.** And, even if the Court found Defendant's arguments about the necessity for significant individualized inquiry regarding the proposed plaintiffs' damages, the rule of law in the Eleventh Circuit is that "the presence of individualized damages issues does not prevent a finding that the common issues

in [a] case predominate." <u>Allapattah</u>, 333 F.3d at 1261.

Some of the unique facts the Court referenced above contributed to the Court's conclusion about Plaintiffs' experts' opinions. First, there is only one defendant in this case, and it has acknowledged that 1) the COCs migrated from its Facility and 2) that the presence of the COCs at the Facility caused it to suffer a diminution in its property value. In addition, Defendant has already acknowledged that it is responsible for the cleanup of the Facility and some properties surrounding it. This fact alone mitigates many of the causation concerns other courts used to deny class certification under Rule 23(b)(3).

Second, the COCs are identified and known to cause harm. Third, both parties' groundwater experts, as well as the FDEP and Defendant's environmental consultant, ARCADIS have acknowledged that there is a groundwater plume filled with COCs lurking under the Azalea Neighborhood. There is, and should be, a spirited debate about the contours and characteristics of the groundwater plume and the geographic size of the proposed class. It is elementary that Plaintiffs would prefer a larger geographic footprint for the proposed class, while Defendant would prefer a smaller one.

Finally, and of particular note when considering Dr. Kilpatrick's opinion, the Pinellas County Property Appraiser already uses a mass-appraisal analysis to determine property values in St. Petersburg, Florida - where the Facility and the Azalea Neighborhood are located. In addition, and as discussed above, the Pinellas County Appraiser has already performed an analysis of the "Azalea Area" which determined that the properties have suffered a diminution in value based on the presence of the contaminated plume.

### ii.  Superiority

The superiority prong of Rule 23(b)(3) focuses on "the relative advantages of a class action suit over whatever other forms of litigation might be realistically available to the plaintiffs." Klay, 382 F.3d at 1269 (citations omitted).  "In many respects, the predominance analysis . . . has a tremendous impact on the superiority analysis for the simple reason that, the more common issues predominate over individualized issues, the more desirable a class action lawsuit will be as a vehicle for adjudicating the plaintiffs' claims." Id. (citations omitted).  The superiority inquiry includes attention to the "likely difficulties in managing a class action."  Fed. R. Civ. P. 23(b)(3).  Rule 23(b)(3) classes are well suited for certification because if each "plaintiffs' claims were tried separately, the amount of repetition would be manifestly unjustified." Boggs v. Divested Atomic Corp., 141 F.R.D. at 67.

"Rule 23(b)(3) provides what the Advisory Committee Notes describe as a non-exhaustive list of four factors that are pertinent to the finding of superiority."  Williams v. Mohawk Indus., Inc., 568 F.3d 1350, 1358 (11th Cir. 2009).  These factors include:

> (A)    the class members' interests in individually controlling the prosecution or defense of separate actions;

> (B)    the extent and nature of any litigation concerning the controversy already begun by or against class members;

> (C)     the desirability or undesirability of concentrating the litigation of the claims in the particular forum; and

> (D)    the likely difficulties in managing a class action.

Here, based on testimony from three of the Named Plaintiffs "[t]here is no reason to

believe that the putative class members in this case have any particular interest in controlling their own litigation, so the first factor does not counsel against class certification." Klay, 382 F.3d at 1269.

On December 1, 2008, one property owner and potential class member filed a separate lawsuit in the Middle District of Florida. See Galligan v. Raytheon Co., No. 8:08-cv-2427-T-33TGW (M.D. Fla. 2008). There are 1000 potential plaintiffs in this class action. One lawsuit does not mean that this second superiority factor now weighs in favor of Defendant.

The third factor, desirability of concentrating the litigation in a particular forum, involves three considerations: (1) economies of time, effort, and expense; (2) aggregation of a large number of claims make it economical to bring suit; and (3) preliminary matters already handled in this forum. Klay, 382 F.3d at 1270-71. This factor weighs in favor of Plaintiffs because the preliminary matters in this suit such as a Motion to Dismiss (Doc. 22) and the Motion to Stay (Doc. 20) have already been addressed in this forum. In addition, through their Post-Hearing Memorandum, Plaintiffs effectively demonstrate the high costs facing any individual plaintiff who wishes to pursue this litigation. Such exorbitant costs would preclude or effectively bar most individual plaintiffs from coming to court. (Doc. 138, pp. 20–26).

Fourth, and given the previous finding that common issues predominate over any individualized issues, the Court "would be hard pressed to conclude that a class action is less manageable than individual actions." Klay, at 1273. Indeed, any management problems

stemming from class certification would certainly pale in comparison to the problems the Court would face if it had to manage hundreds of separate lawsuits. The Court is convinced that altogether, Plaintiffs have shown that "it would be better to handle this case as a class action instead of clogging the federal courts with innumerable individual suits litigating the same issues repeatedly." Id.

Finally, Defendant claims that Plaintiffs lack of a trial plan for this case is clear evidence the Court will have difficulty managing this class action, and by implication, that a class action suit is not the superior means of proceeding here. (Sept. 23, 2009, Hr'g Tr. 324:21-326:22). Essentially, Defendant argues that Plaintiffs did not present a trial plan because they have no idea how they can or will be able to present at trial the substantial amount of factual and expert evidence necessary to prove their case. (Sept. 23, 2009, Hr'g Tr. 325:8-13). At the Hearing, Defendant's counsel argued that the Eleventh Circuit's recent opinion in Vega supports its claim. (Sept. 23, 2009, Hr'g Tr. 325:14-327:6).

In Vega, the Eleventh Circuit vacated an Order in which the district judge granted Plaintiffs' motion for class certification and remanded it with the instruction that the plaintiff's claims proceed individually. Vega, 564 F.3d at 1256. Here, unlike Vega, trial is not imminent. Plaintiffs' failure to appear at the Hearing with a detailed trial plan, under the timing and circumstances of this case, is not fatal. The Court appreciates and understands Defendant's argument on this point. However, the argument is not strong enough for Defendant to prevail under this Rule 23 Factor.

## VIII. Conclusion

The Court finds that after considering the evidence adduced to date, the unique facts of this mass tort case makes certification appropriate at this juncture. However, the Court notes that Class certification is not an immutable decision. If at any time it appears that a plaintiff fails to meet the requirements of Rule 23, the certification may be withdrawn. AMJUR. FEDCOURTS § 1585; *In re* Carbon Dioxide Antitrust Litig., 149 F.R.D. 229, 232 (M.D. Fla. 1993).

Accordingly, and upon consideration of the evidentiary record developed to date, it is **ORDERED, ADJUDGED** and **DECREED** that:

The Class Certification Motion (Doc. 83) is **GRANTED**.

**DONE** and **ORDERED** in Chambers in Tampa, Florida on this <u>30th</u> day of September 2009.

VIRGINIA M. HERNANDEZ COVINGTON
UNITED STATES DISTRICT JUDGE

Copies to: Counsel of Record